**FIRST NATIONAL BANK OF FORT WALTON BEACH, Plaintiff-Appellee,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant-Appellant.**

**No. 27148.**

United States Court of Appeals Fifth Circuit.

Sept. 17, 1969.

Before WISDOM and MORGAN, Circuit Judges, and DAVIS,* Judge of the U. S. Court of Claims.

DAVIS, Judge:

Plaintiff-appellee, First National Bank of Fort Walton Beach (Bank), sued defendant-appellant, United States Fidelity and Guaranty Company (USF&G), claiming a right to indemnification under a Banker's Blanket Bond, in force between the Bank and USF&G, for losses incurred on a loan by the former. The District Court for the Northern District of Florida awarded the Bank $57,130.70, plus attorney's fees of $5,713.00, and the defendant has appealed.[1]

On April 10, 1962, plaintiff was insured by defendant under this Banker's Blanket Bond. The insurance purported to cover certain losses resulting from loans obtained by fraud.

In December 1961, the Bank had begun a series of loans to Jo Vonne M. Barnes which continued over a number of years. These were made on the strength of a program certificate of membership in the Dreyfus Investment Program, as well as two later "Dividend Reinvestment Advices" and a "Confirmation of Dividend Reinvested" issued in 1964 and 1965 by the Bank of New York, as custodian for the Dreyfus Investment Program. The latter papers each stated the total shares held by the investor in the Program at the particular time. About $40,000 was loaned to Miss Barnes in 1964–1965 on the strength (at least in part) of these writings.

Upon completion of the loans, the Bank discovered that the "Advices" and the "Confirmation", issued in 1964 and 1965, had been falsified, and that, in fact, she then owned very few shares in the Program, far less than the face of those papers had indicated. After unsuccessful attempts to collect the amounts

D. L. Middlebrooks, Harrell, Caro, Middlebrooks & Wiltshire, Pensacola, Fla., for defendant-appellant.

Roderic G. Magie, Beggs, Lane, Daniel, Gaines & Davis, Pensacola, Fla., for plaintiff-appellee.

* Sitting by designation.

1. The District Court's memorandum decision rejecting USF&G's motion to dismiss the complaint is reported at 274 F.Supp. 305. Thereafter the Bank moved for summary judgment which was granted, and the parties then agreed upon the amount of recovery.

due, the Bank demanded reimbursement of its losses from USF&G, but the defendant refused payment. It contends that the losses were not insured under the bond because not within any of its terms.

■ The only issue before us is the liability of USF&G under the bond. The parties are agreed that, if there is liability, the amounts granted below are correct. See footnote 1, *supra*. Theoretically, since this is a diversity-of-citizenship case begun by the Florida Bank in a state court and removed to the District Court by the Maryland defendant,[2] there is a conflict-of-laws problem as to whether Florida or Maryland law governs. But neither party has relied on the law of any particular jurisdiction, both have argued as if the question is one of general law, and there do not seem to be any Florida or Maryland cases which are at all close. We shall assume, accordingly, that the law of both of those states accords with the general law, as we find it to be. *Cf.* Fidelity Trust Co. v. American Surety Co. of New York, 268 F.2d 805, 807 (C.A. 3, 1959).

The Bank invokes two parts of the bond—clause (D), entitled "Forgery or Alteration", and clause (E), headed

"Securities". We hold that USF&G is responsible under (E), and it is therefore unnecessary to consider (D).

Under (E),[3] the critical question is whether the altered "Advices" and "Confirmation" fall within the phrase "any securities, documents, or other written instruments". (It is in effect conceded that, if they are, the other stated conditions of (E) are met.) Two of the three writings are called "Dividend Reinvestment Advice"; the other is a "Confirmation of Dividend Reinvested". These are printed forms, headed by the legend "The Bank of New York, Custodian for the Dreyfus Investment Program Sponsored by the Dreyfus Corporation", and containing boxes to be filled in, showing in typing (among other things) the date the dividend was declared, the amount declared or received for the investor, the shares purchased for him, and the total shares then held by him. Attached to each paper are stubs for "next payments", if any, are due, but in Miss Barnes' case these stubs showed the account as "fully paid".

USF&G's point is that (E) covers only conventional securities (like stocks or bonds) or other documents or instruments which are accepted as in themselves documentary evidence of owner-

---

2. USF&G's principal place of business is also in Maryland.

3. "Any loss through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or raised or otherwise altered or lost or stolen, or through the Insured's having, in good faith and in the course of business, guaranteed in writing or witnessed any sig-

natures, whether for valuable consideration or not and whether or not such guaranteeing or witnessing is ultra vires the Insured, upon any transfers, assignments, bills of sale, powers of attorney, guarantees, endorsements or other documents upon or in connection with any securities, obligations or other written instruments; EXCLUDING, HOWEVER, any loss through FORGERY OR ALTERATION of, on or in any checks, drafts, acceptances, withdrawal orders or receipts for the withdrawal of funds or Property, certificates of deposit, letters of credit, warrants, money orders or orders upon public treasuries; and excluding, further, any loss specified in subdivisions (1) and (2) of Insuring Clause (D) as printed in this bond, whether or not any amount of insurance is applicable under this bond to Insuring Clause (D).

"Mechanically reproduced fascimile signatures are treated the same as handwritten signatures."

ship of property—and that here the papers simply gave information to the investor and were not in themselves intrinsic evidence of her ownership of shares in the Dreyfus Investment Program.[4] The Bank responds that the general, unqualified terms "documents, or other written instruments" plainly have a wide coverage, and in context must at least blanket a written paper indicating or reflecting specific ownership of a security, or of rights of participation in assets.

Textual arguments can be made for both sides. For USF&G, it is pointed out the clause is entitled "Securities", and, in the words of the Supreme Judicial Court of Massachusetts, this "suggests that clause (E) is dealing with 'securities and writings something like securities' and it speaks against an intention to encompass all writings or all formal writings." Rockland-Atlas National Bank v. Massachusetts Bonding & Insurance Co., 338 Mass. 730, 157 N.E.2d 239, 243 (1959). Also, the enumeration of the category of signers whose signatures may be forged can be thought to indicate only a "true" instrument, i. e., a "writing, made and executed as the expression of some act, contract, or proceeding, as a deed, writ, etc." Ibid. Similarly, the words "instruments" and "documents" are used restrictively in the latter part of (E), dealing with the guaranty or witnessing of signatures, and this tends to show that these terms likewise have a limited meaning in the earlier parts of (E). Ibid. These linguistic contentions are all aids to the claim that the information papers involved here were not "documents" or "instruments" in the sense intended by clause (E).

On the other hand, the Bank can say that the provision, by its enumeration, necessarily differentiates among "securities", "documents" and "other written instruments", and must therefore cover more than "securities" themselves; that "documents" and "written instruments" are very broad words, embracing, in ordinary speech, forms such as those involved there; and that there is nothing on the face of the bond to suggest that these broad words fail to cover, at least, formal writings declaring the ownership of securities or shares (even though these writings do not, in themselves, have "legal efficacy" to pass title).

If the result is to be determined by these textual considerations alone, there is more to the Bank's position than USF&G admits. In Rockland-Atlas National Bank, supra, on which appellant relies, recovery was refused where the insured participated in a loan on the strength of a balance sheet purportedly prepared by a certified public accountant from the records of the borrower, but in actuality false and not made by the accountant or with his authority. But that is quite a different case. A balance sheet gives an over-all view and does not ordinarily evidence or declare ownership of specific securities or participation rights. Moreover, it is a reflection of the general state of a business, not a writing "made and executed as the expression of some act, contract, or proceeding"—the definition of "instrument" accepted and used by the Massachusetts court. The writings here differed in both respects. They declared ownership of a specified number of shares in the Dreyfus Investment Program. And they can easily be said to have been written and given to the investor as an expression of the formal and operative act of the custodian (The Bank of New York) in reinvesting the investor's newly-received dividends in the Program's shares. Though the writings may have had no "legal efficacy" in and of themselves, they did express and reflect the custodian's act of purchasing additional

---

4. Appellant distinguishes these advices from the program certificate, originally put up in 1961 by Miss Barnes as collateral. It is conceded that the certificate itself, if it had been altered or forged, would have been within clause (E) because, in appellant's eyes, it was to be treated as if it were a stock certificate.

shares, and they did evidence the investor's ownership of a specific number of shares in the Dreyfus Program.[5]

■ We think, however, that these textual arguments are not decisive but that the Bank should prevail because of the well settled principle of contract law that, where one party has no real power to affect the terms of the agreement, ambiguities will be interpreted against the drafter. Prudential Insurance Co. of America v. Barnes, 285 F.2d 299, 300 (C.A. 9, 1960); Hoffman v. Illinois National Casualty Co., 159 F.2d 564, 565 (C.A. 7, 1947); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876–877, 163 Ct.Cl. 1, 6 (1963). This is especially true with respect to insurance contracts. *See* Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 84–85, 54 S.Ct. 590, 78 L.Ed. 1137 (1934). In the instant case there is no intimation in the record that plaintiff had any real freedom of choice or bargaining power to determine the terms of the bond. In fact, the cases cited by both USF&G and the Bank tend to prove the contrary, since the clauses involved in past litigation were identical to those under scrutiny here. Liberty National Bank & Trust Co. of Louisville v. National Surety Corp., 330 F.2d 697 (C.A. 8, 1964); Fidelity Trust Co. v. American Surety Co. of New York, 268 F.2d 805 (C.A. 3, 1959); Snyder National Bank v. Westchester Fire Ins. Co., 294 F.Supp. 500 (N.D.Tex.1968); First American State Bank v. Aetna Casualty & Surety Co., 25 Wis.2d 190, 130 N.W.2d 824 (1964); Rockland-Atlas Nat'l Bank of Boston v. Massachusetts Bonding & Ins. Co., *supra*, 338 Mass. 730, 157 N.E.2d 239 (1959); Union Banking Co. v. United States Fidelity & Guaranty Co., 4 Ohio App.2d 397, 213 N.E.2d 191 (1965).

■ USF&G contends that the Banker's Blanket Bond was a joint effort of the Surety Association of America and the American Banker's Association, but plaintiff points out that there is no evidence that the Bank was a member of that organization. In any event, all that appellant claims is that the Banker's Association approved the final form of the bond, as revised in 1951. This is not the same as a true joint effort, with negotiation and give-and-take on both sides. Rather, it is like government form-contracts which are submitted for criticism to interested trade associations. Since the Federal Government reserves to itself the final word, the right to comment which has been accorded potential contractors does not prevent these standard forms from being construed against the Government in case of real ambiguity. See WPC Enterprises, Inc. v. United States, *supra*, 323 F.2d 874, 876–877, 163 Ct.Cl. 1, 6 (1963). In view of the obvious fact that a standard form contract was used here ("Banker's Blanket Bond, Standard Form No. 24"), it is incumbent upon the insurer to bear the burden of showing that the Bank was instrumental in drafting the agreement, or was adequately and actively represented in the negotiations. The record is barren of such evidence.

■ This principle that ambiguities in standard forms should be resolved against the drafter has been applied to clause (E) of this bond. Fidelity Trust Co. v. American Surety Co., 268 F.2d 805, 807 (C.A. 3, 1959); Union Banking Co. v. United States Fidelity & Guaranty Co., 4 Ohio App.2d 397, 213 N.E.2d 191, 195–196 (1965); Snyder Nat'l Bank v. Westchester Fire Ins. Co., 294 F.Supp. 500, 503 (N.D.Tex.1968); *contra*, First Nat'l Bank in Wichita v. St. Paul Fire & Marine Ins. Co., U.S.Dist.Co.,

---

5. In Fidelity Trust Co. v. American Surety Co. of New York, 268 F.2d 805 (C.A. 3, 1959), paragraph (E) was held, without discussion, to cover duplicate invoices of the borrower evidencing an account receivable. In Snyder Nat'l Bank v. Westchester Fire Ins. Co., 294 F.Supp. 500 (N.D.Tex., 1968), the paper held covered by (E) was a false telegram, allegedly from a brokerage firm, stating that securities of the borrower had been sold and the check sent to the lending bank. Neither of these documents had any "legal efficacy" in and of itself.

D.Kansas, No. W–3093, decided September 29, 1965 (unreported).[6] Under the canon, the Bank's reading of "documents or other written instruments" in the present context—a reading which, as we have shown, may well be correct and is certainly reasonable—must be accepted.[7]

USF&G also contends that plaintiff's negligence in failing to investigate the authenticity of the advices" should preclude it from recovery. There is no merit in this position. Clause (E) insures against losses suffered through loans or purchases by the insured made "in good faith and in the course of business". There is no exclusion for an insured's negligence. Nor is there the slightest indication in the record that the Bank did not act in good faith. Ordinary negligence, without more, does not convert good faith into bad. Citizens Bank of Oregon v. American Ins. Co., 289 F.Supp. 211, 214 (D.Or.1968); First Nat'l Bank of Crandon v. United States Fidelity & Guaranty Co. of Baltimore, 150 Wis. 601, 137 N.W. 742, 745 (1912); *cf.* Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 86, 54 S.Ct. 590, 593, 78 L.Ed. 1137, 1141 (1934). Had negligence been intended as a good defense to payment for injuries covered by (E), it should have been set out in the agreement. Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 86, 54 S.Ct. 590, 593, 78 L.Ed. 1137, 1141 (1934).

The judgment is

Affirmed.

6. In First American State Bank v. Aetna Casualty & Surety Co., 25 Wis.2d 190, 130 N.W.2d 824, 827 (1964), the Supreme Court of Wisconsin reserved the question whether (E) was intended "to cover only those writings which have legal efficacy", but in an obvious hint that the matter was hardly free from doubt the opinion commended the problem "to the attention of the draftsmen of the bond." Rockland-Atlas Nat'l Bank v. Massachusetts Bonding & Ins. Co., *supra*, 338

Mass. 730, 157 N.E.2d 239, did not advert to the bearing of the ambiguity principle.

7. The last part of. (E), footnote 3, *supra*, excludes "any loss specified in subdivisions (1) and (2) of Insuring Clause (D) * * *". Since appellant urges that (D) is inapplicable, we assume it does not raise the point that this condition has been fulfilled.